Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 21, 2003　　　　Decided February 18, 2003

No. 01–1487

ENTERGY SERVICES, INC.
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TENASKA, INC., ET AL.,
INTERVENORS

————

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

————

*J. Wayne Anderson* argued the cause for petitioner.  With him on the briefs was *Floyd L. Norton IV*.

*Andrew W. Tunnell* was on the brief for amicus curiae Southern Company Services, Inc. in support of petitioner.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Laura J. Vallance*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Dennis Lane*, Solicitor.

*Ashley C. Parrish* argued the cause for intervenors Tenaska, Inc. and Washington Parish Energy Center, LLC. With her on the brief were *Neil L. Levy*, *Larry F. Eisenstat* and *M. Eric Eversole*.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Entergy Services, Inc. petitions for review of two orders of the Federal Energy Regulatory Commission resolving whether some or all transmission customers should pay for a class of network upgrades to an electric utility's transmission grid whose purpose is to protect those generators and equipment in the vicinity of a new interconnecting generator against fault currents. The Commission found that two of Entergy's Interconnection and Operating Agreements calling for "direct assignment" of costs to the new interconnecting generators of systems upgrades to remedy short-circuit and stability problems were inconsistent with Commission policy and accepted the proposed Agreements subject to revision of the credit provisions. *Entergy Servs., Inc.*, 95 F.E.R.C. ¶ 61,437, at 62,610–11 (2001) ("*Initial Order*"). Because the *Pro Forma* Interconnection and Operating Agreement ("*Pro Forma* IA") in Entergy's Open Access Transmission Tariff ("tariff") also contained a direct assignment provision for this class of network upgrades, the Commission ordered Entergy to revise it. *Id.* at 62,611. In denying rehearing, the Commission rejected Entergy's arguments that the policy reflected in the *Initial Order* was inconsistent with Commission precedent, inappropriately upsets the balance of costs and responsibilities for interconnection upgrades, and improperly directed revision of a previously approved tariff not at issue. The Commission reiterated that its policy has been that all transmission customers must share the costs of network upgrades because "the integrated

transmission grid is a cohesive network," and the upgrades "benefit *all* users, not just the newly-interconnecting generator." *Entergy Servs., Inc.*, 96 F.E.R.C. ¶ 61,311, at 62,202 (2001) ("*Rehearing Order*") (emphasis in original).

In challenging the Commission's orders, Entergy, joined by amicus Southern Company Services, Inc., renews its contention that the *Initial Order* conflicts with Commission precedent that required direct assignment of costs to a new generator of short-circuit and stability network upgrades necessitated by its interconnection to the transmission grid, and contends that in changing its policy the Commission failed to provide a reasoned explanation, a hearing or commencement of a rulemaking proceeding. Entergy disputes the Commission's conclusion that new generator interconnections benefit all users on the transmission grid, maintaining that, contrary to the Commission's cost-causation pricing methodologies, the *Initial Order* shifts generation interconnection costs from the interconnecting party to other transmission customers and captive ratepayers who do not benefit from the interconnection. Entergy further contends that the Commission improperly ordered revision of two bilaterally executed contracts without any hearing or investigation to determine that they and Entergy's *Pro Forma* IA in its tariff were contrary to the public interest.

We hold first, that although Entergy's challenge regarding the GenPower Keo, LLC Interconnection and Operating Agreement is moot, the appeal is not moot because the Commission required Entergy to alter its *Pro Forma* IA in its tariff. We hold second, that the Commission did not act in an arbitrary and capricious manner by clarifying its policy regarding credits for short-circuit and stability network upgrades and provided a reasoned explanation for its change in policy. We hold third, that there is sufficient support for the Commission's conclusion that its pricing policy provides a systemwide benefit for all users of Entergy's grid, and, therefore, Entergy's *Pro Forma* IA in its tariff was unjust and unreasonable, and that the Commission did not otherwise violate the Federal Power Act ("FPA"), 16 U.S.C. § 824e (2000). Accordingly, we deny the petition for review.

## I.

Consistent with the Commission's decision in *Tennessee Power Co.*, 90 F.E.R.C. ¶ 61,238 (2000), that interconnection is an element of transmission service and must be offered under the terms of Order No. 888's *pro forma* tariff, Entergy submitted a *Pro Forma* IA and proposed procedures and requirements for adding generation to Entergy's transmission system. The Commission, by Order of May 18, 2000, accepted Entergy's proposals for filing, subject to various modifications. *See Entergy Servs., Inc.*, 91 F.E.R.C. ¶ 61,149, at 61,556 (2000) ("*May 18 Order*"). The Commission ordered that Entergy include, in a compliance filing, its *Pro Forma* IA and interconnection procedures in its tariff, and a complete explanation of the crediting procedures for "Optional System Upgrades," defined as increases to Entergy's transmission capability. *Id.* at 61,559–60. As proposed and accepted for filing, then, Entergy's *Pro Forma* IA provided credits against future transmission charges only for "Optional" network upgrades, while directly assigning to the new interconnecting generator the costs for "Required" network upgrades, defined as upgrades "necessary for safe and reliable interconnection of a new generator, regardless of whether there is output from the generator," *id.* at 61,560, and included short-circuit and stability upgrades. *See Initial Order*, 95 F.E.R.C. at 62,611.

The petition, as filed, involves the Interconnection and Operating Agreements ("IAs") that Entergy executed with two electric power generators—Washington Parish Energy Center, LLC, and GenPower Keo, LLC. In accord with the *May 18 Order* and the *Pro Forma* IA, the IAs required these generators to bear the costs of the short-circuit and stability upgrades necessary to prevent their interconnection to Entergy's grid from undermining the integrity of the grid. The Commission accepted the IAs subject to revision, in light of the Commission's May 17, 2001 clarification in *Consumers Energy Co.*, 95 F.E.R.C. ¶ 61,233 (2001), to allow the generators to receive transmission credits for the costs of these network upgrades once the generators were connected to the transmission system; the Commission also ordered that the

*Pro Forma* IA in the tariff approved in the *May 18 Order* be similarly revised. *Initial Order*, 95 F.E.R.C. at 62,611. On rehearing, the Commission rejected Entergy's arguments, including its argument that the Commission's order was inconsistent with its precedent, explaining that allowing transmission credits for these types of network upgrades is consistent with long-standing Commission policy and that language in earlier Commission orders suggesting to the contrary was inadvertent. *Rehearing Order*, 96 F.E.R.C. at 62,201–02.

## II.

As a threshold matter, the Commission contends that the court lacks jurisdiction to consider Entergy's challenge regarding the GenPower IA because it is moot. In response to Entergy's request, the Commission states in its brief that it approved termination of the GenPower IA effective May 16, 2002. Entergy does not dispute this assertion. Under the circumstances, then, this portion of Entergy's appeal is moot. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997); *Pub. Util. Comm'n of California v. FERC*, 236 F.3d 708, 713–16 (D.C. Cir. 2001); *Northwest Pipeline Corp. v. FERC*, 863 F.2d 73, 76 (D.C. Cir. 1988).

Entergy correctly states, however, that the appeal itself is not moot. Entergy does not challenge in its Reply Brief the assertion by intervenors Tenaska, Inc. and Washington Parish Energy Center, LLC that because the Washington Parish IA does not require any network upgrades and Entergy has not awarded any, there are "serious questions whether the hardship that Entergy has allegedly suffered has 'the concrete quality and immediacy necessary to invoke judicial review.'" Intervenors' Br. at 28 (quoting *Tennessee Gas Pipeline Co. v. FERC*, 736 F.2d 747, 748 (D.C. Cir. 1984)). However, the *Initial Order* directed Entergy to revise its *Pro Forma* IA in its tariff to be consistent with *Consumers Energy*, 95 F.E.R.C. ¶ 61,233. Thus, the court has jurisdiction to consider Entergy's challenge to the *Pro Forma* IA, which provides standardized procedures and agreements

when generators seek to interconnect on Entergy's transmission system. Entergy states that it has filed approximately sixteen IAs providing, consistent with its revised *Pro Forma* IA, credits for "Required" network upgrades and has withheld execution of these agreements pending this appeal. *See* Reply Br. at 23. Thus, as Entergy points out, it is aggrieved by the *Initial Order* and is suffering ongoing harm that can be redressed by a favorable judicial decision. *See Spencer v. Kemna*, 523 U.S. 1, 17 (1998); *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983); *United States v. Weston*, 194 F.3d 145, 148 (D.C. Cir. 1999).

## III.

Turning to Entergy's challenge to the Commission's global revision to the *Pro Forma* IA, our review of the Commission's orders is pursuant to the arbitrary and capricious standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See Process Gas Consumers Group v. FERC*, 292 F.3d 831, 836 (D.C. Cir. 2002). An agency's interpretation of its own precedent is entitled to deference by the court. *See Cassell v. FCC*, 154 F.3d 478, 483 (D.C. Cir. 1998). Further, in light of the technical nature of rate design, involving policy judgments at the core of the regulatory function, the court's review of challenges to rate design as unjust and unreasonable is highly deferential. *See Sithe/Independence Power Partners v. FERC*, 165 F.3d 944, 948 (D.C. Cir. 1999).

## A.

Insofar as Entergy's challenge to the Commission's orders rests on the contention that the Commission impermissibly departed from its precedent, it is without merit. Entergy relies on cases holding that while an agency may change its policy based on its view of the public interest, *see Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970), it must provide "a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored," *id.*, and contends that the Commission

failed to do so. *See also Cross–Sound Ferry Servs., Inc. v. ICC*, 873 F.2d 395, 398 (D.C. Cir. 1989).

On rehearing the Commission acknowledged that language in certain of its prior orders could be read to permit the direct assignment of the costs of short-circuit and stability network upgrades. *Rehearing Order*, 96 F.E.R.C. at 62,202. The Commission referred to *Consumers Energy*, 95 F.E.R.C. at 61,804 & n.9, *reh'g denied*, 96 F.E.R.C. ¶ 61,132, at 61,559–60 (2001), where the Commission had corrected what it characterized as "inadvertent" language in *American Electric Power Service Corp.*, 91 F.E.R.C. ¶ 61,308, at 62,051–52 (2000), and other orders, suggesting that a generator receives transmission credits only when the network upgrades are needed to remove overloads and not when network upgrades are needed to address short-circuit and stability problems. *Rehearing Order*, 96 F.E.R.C. at 62,201–02. Citing *Public Service Company of Colorado*, 59 F.E.R.C. ¶ 61,311 (1992), *reh'g denied*, 62 F.E.R.C. ¶ 61,013, at 61,060–62 (1993) ("*PSC of Colorado*"), where it declined to depart from its policy prohibiting direct assignment of grid facilities that benefit all customers even if grid facilities would not be installed "but for" a particular customer's service, the Commission in *Consumers Energy* stated that its "long-standing policy prohibits direct assignment of network facilities, and failure to provide credits for network upgrades made to remedy short-circuit and stability problems would violate that precedent." *Consumers Energy*, 95 F.E.R.C. at 61,804. The Commission ordered Consumers Energy to revise its crediting provisions to allow crediting for network upgrades necessary to remedy short-circuit and stability problems, stating that by requiring credits for these upgrades, "the Commission was enforcing its prohibition against 'and' pricing." *Id.*

Consequently, we conclude that even if the Commission's orders constitute more than a mere clarification of policy, as Entergy maintains, the Commission provided a reasoned explanation for the change in policy. In the orders on review, the Commission was clarifying inadvertent statements in prior orders that would have allowed "and" pricing, where a customer pays for use of the grid at its incremental expansion

cost and later is also charged for use of the grid at its average cost. *See Pennsylvania Elec. Co.*, 58 F.E.R.C. ¶ 61,278, *reh'g denied*, 60 F.E.R.C. ¶ 61,034, at 61,127 (1992). Otherwise the Commission's rejection of "but for" pricing arguments, equating pricing use of the grid based on incremental cost to expand the grid ("but for" costs) with the prohibited direct assignment of grid costs, was consistent. Entergy points to the statement in *Removing Obstacles to Increased Electric Generation and Natural Gas Supply in the Western United States*, 94 F.E.R.C. ¶ 61,272, at 61,970 (2001), *further order*, 95 F.E.R.C. ¶ 61,225, at 61,767 n.24 (2001) ("*Removing Obstacles*"), that the Commission's "policy had been to allow the cost of interconnection and the cost of certain incremental system upgrades to be borne by those loads or supplies on the margin." *Removing Obstacles*, 95 F.E.R.C. at 61,767 n.24. But its reliance is misplaced, for the Commission responds appropriately that while "modif[ying] the option to price certain transmission service at an incremental rate," the language leaves undisturbed "the policy of providing credits for network upgrades." Respondent's Br. at 28 (quoting *Removing Obstacles*, 96 F.E.R.C. ¶ 61,155, at 61,674 (2001)). Entergy fails to reference the third order in the line of *Removing Obstacles* orders.

### B.

Somewhat more problematic for the Commission is Entergy's contention that the Commission was arbitrary and capricious because its allowance of credits is based on the erroneous view that short-circuit and stability network upgrades benefit all users of the transmission system. Entergy maintains that instead of benefitting the entire system, these short-circuit and stability upgrades benefit only the generator connecting to the transmission system. Entergy rejects the notion that by preventing degradation of the reliability of the transmission system, these upgrades enhance the system and thereby benefit all users. Absent expansion of the capacity or enhancement of the reliability of the system beyond that which existed prior to the new interconnection, there is, in Entergy's view, no benefit to all system users. Responding

to the Commission's focus on incentives to spur interconnection of new generation and the need to ease entry for competing generation, Entergy characterizes the Commission's incentives as a subsidy, reducing costs for one market participant at the expense of others. Upon review of the Commission's orders, we ultimately conclude that the Commission supplied sufficient reasoning for its policy judgment. *See Western Massachusetts Elec. Co. v. FERC*, 165 F.3d 922, 927–28 (D.C. Cir. 1999) (quoting *Pennsylvania Elec. Co. v. FERC*, 11 F.3d 207, 211 (D.C. Cir. 1993)). *See also Sithe*, 165 F.3d at 948.

The Commission stated on rehearing that:

> As we noted in *Consumers Energy*, the integrated transmission grid is a cohesive network whose expansion benefits all users of the grid. Even if they do not increase network capacity, short-circuit and stability-related upgrades that facilitate network expansion benefit *all* users, not just the newly-interconnecting generator, since the grid is continuously expanding and *all* users of the grid benefit from its continued stability.

*Rehearing Order*, 96 F.E.R.C. at 62,202 (emphasis in original). Entergy attacks such statements as conclusory and circular. There is some merit to this position. The Commission's view stems from its previous decisions concluding that a larger system is a better system. *See, e.g.*, *PSC of Colorado*, 62 F.E.R.C. at 61,061. Still *PSC of Colorado* does little to offer a rationale.

It is true the Commission said more on rehearing, noting that the reliability upgrades "are crucial to protect other generators and equipment in the vicinity of the new generator against potential damage resulting from fault currents." *Rehearing Order*, 96 F.E.R.C. at 62,202 n.27 (quoting *Consumers Energy*, 96 F.E.R.C. at 61,561). Entergy does not challenge this as a factual statement and its description of its experience in attracting interconnection suggests that such protection is of benefit to it. Indeed, in *Western Massachu-*

*setts*, the court recognized that upgrades designed to "preserve the grid's reliability" constitute "system enhancements [that] are presumed to benefit the entire system." 165 F.3d at 923, 927. On rehearing, the Commission also stated that by prohibiting "and" pricing, the crediting policy "merely places new generators on an equal footing with pre-existing generators owned by utilities" with regard to interconnection costs and that rather than "sending the wrong price signals," its policy "will promote the interconnection of generation that is sorely needed in various regions of the country." *Rehearing Order*, 96 F.E.R.C. at 62,203. Entergy's attack on the Commission's focus on the need for incentives for generation in certain regions may be, to some extent, well founded. It asserts in its Reply Brief that some markets, such as Texas, relied on by intervenors Tenaska, Inc. and Washington Parish Energy Center, LLC, are unique, and that Entergy's own experience indicates that generation occurs without subsidization as the location for new generation is often dictated by the proximity of natural gas pipelines and the ability to sell power beyond Entergy's service area.

Our conclusion that the Commission has adequately set forth its rationale, however, rests on its explanation in the *Consumers Energy* decisions that the Commission relied upon in the orders on review. *See Initial Order*, 95 F.E.R.C. at 62,611; *Rehearing Order*, 96 F.E.R.C. at 62,201–03 & nn.17 & 19. In addition to evidence that these reliability upgrades are crucial to protect generation and other equipment in the vicinity of the new generator from fault currents, the Commission explained in denying rehearing in *Consumers Energy* that "[h]aving a standard policy that requires credits for customer-funded network upgrades minimizes the incentive for utilities to 'gold plate' their systems at customers' expense, and thereby reduces the potential for disputes . . . over what constitutes a necessary upgrade." *Consumers Energy*, 96 F.E.R.C. at 61,560. Further, the Commission explained, its crediting policy creates more accurate price signals by placing "new generators on an equal footing with pre-existing, utility-owned generators whose transmission costs generally were rolled into [the] transmission rate base." *Id.*

The Commission's rationale for crediting network upgrades, based on a less cramped view of what constitutes a "benefit," reflects its policy determination that a competitive transmission system, with barriers to entry removed or reduced, is in the public interest. That Entergy would confine "benefits" to increases in capacity of the transmission system or to enhancements other than maintained stability in an expanded system, while not an implausible approach, overlooks the Commission's long-held view of the benefits of expansion and the role of network system upgrades. Entergy's attempt to challenge the Commission's view of "benefit" by distinguishing its precedent does not negate the consistent application of the Commission's long-held view. While Entergy points out, for example, that *PSC of Colorado* addressed direct assignment of radial transmission facilities to serve remote native load and not interconnection of generation or direct assignment of facilities necessary for interconnection, the Commission's crediting policy for short-circuit and stability upgrades is consistent with its view in that case that the transmission grid is an integrated whole. *See PSC of Colorado*, 62 F.E.R.C. at 61,061. Moreover, the Commission points out, because *PSC of Colorado* was decided when generation and transmission were predominantly offered as a bundled service, "the exact functionalization of costs between generation and transmission was not a critical issue." Respondent's Br. at 10. When confronted with that issue the Commission concluded that such system enhancements benefit the entire system. In *Western Massachusetts*, for example, the Commission stated there was a systemwide benefit based on three considerations: (1) "the physical configuration of the upgrades makes it clear that their purpose is not merely to provide a power path from the [new] facility to the [transmission] grid . . . but to enhance a system used by many customers"; (2) "loadflow over the upgraded grid facilities will not remain constant"; and (3) "it cannot be determined for sure that the upgrades would merely restore the transfer capability of the [transmission] grid to the precise level that existed prior to the [new] interconnection." *Western Massachusetts*, 165 F.3d at 927.

While Entergy does not view the expanded transmission system as an enhanced system over the fault-free system that existed prior to an interconnection by a new generator, we conclude that in light of the regulatory expertise to which courts owe deference, the Commission has reasonably explained that its crediting pricing policy avoids both gold plating and less favorable price signals such that the enlarged transmission system, which it views as a public good, can function reliably and continue to expand. Consequently, we conclude there is adequate support for the Commission's determination that short-circuit and stability network upgrades are an enhancement that benefits all users.

Entergy's other challenges to the Commission's pricing policy fare no better. Entergy's contention that the Commission acted unlawfully because it failed to undertake a factual analysis of the short-circuit and stability upgrades to determine whether they provide system benefits ignores the fact that the Commission relied on Entergy's statements regarding the problems the upgrades were designed to resolve, as Entergy noted in its Rehearing Request. *See Rehearing Order*, 96 F.E.R.C. at 62,202 n.21. Regarding Entergy's subsidy contention, the Commission has long rejected the argument that transmission credits for network upgrades result in "cross subsidization" by native load customers as based on the faulty premise that native load customers receive no benefit from the upgrades; no subsidization occurs except where customers pay for other customer's sole use facilities. *See PSC of Colorado*, 62 F.E.R.C. at 61,062. Entergy's reliance on a statement in Order No. 2000 concerning averaging or socialization of costs is misplaced; the Commission was referring to congestion management costs that do not involve generator interconnection. *See Regional Transmission Organizations*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089, at 31,219 (1999), 65 Fed. Reg. 810 (2000), *on reh'g,* Order No. 2000–A, FERC Stats. & Regs. ¶ 31,092, 65 Fed. Reg. 12,088 (2000) (codified at 18 C.F.R. § 35.34), *aff'd, Pub. Util. Dist. No. 1 v. FERC*, 272 F.3d 607 (D.C. Cir. 2001). Order No. 2000 states that generally cost causation principles should be followed "[w]here possible and cost effective,"

leaving open the possibility of cost averaging in some cases. *Id.* Hence, Entergy fails to point to anything in Order No. 2000 that would undermine the Commission's finding that crediting network upgrades will send the proper pricing signals and result in the economically efficient outcomes. Entergy's adoption of amicus Southern's contention that the *Initial Order* and the *Rehearing Order* are contrary to sections 721 and 722 of the Energy Policy Act of 1992, 16 U.S.C. §§ 824j, 824k (2000), is not properly before the court; this statutory argument was not raised in Entergy's initial brief, *see Michel v. Anderson*, 14 F.3d 623, 625 (D.C. Cir. 1994), nor raised on rehearing to the Commission as required under the FPA § 313(b), 16 U.S.C. § 825l(b). *See United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1170 (D.C. Cir. 1996).

### C.

Finally, Entergy essentially revives its "but for" argument in contending that the Commission failed to investigate and address the underlying facts in its cost allocation decisions and hence, without a hearing, unlawfully ordered modification of Entergy's *Pro Forma* IA provisions in its tariff. As the Commission stated on rehearing, "[u]nder FPA Section 206, 16 U.S.C. § 824e (2000), the Commission may require a public utility to revise its tariff to reflect a Commission policy determination that the existing tariff is unjust and unreasonable and that the required change is just and reasonable," and "may take action under Section 206 in a proceeding that began as a Section 205 proceeding." *Rehearing Order*, at 62,203 n.34 (citing *Sea Robin Pipeline Co. v. FERC*, 795 F.2d 182, 184 (D.C. Cir. 1986)). Absent any new argument to rebut the Commission's long-standing rejection of direct assignment of network costs, the Commission's determination that the *Pro Forma* IA was unjust and unreasonable is amply supported. *See Consumers Energy*, 96 F.E.R.C. at 61,560 & n.21.

Nor did the Commission abuse its discretion in finding that a formal oral evidentiary hearing was neither necessary nor required. *See Arkansas Elec. Energy Consumers v. FERC*,

290 F.3d 362, 369–70 (D.C. Cir. 2002). Entergy had a full opportunity to present its views in its filings, and it fails to point to any evidence that could have been submitted or developed only through additional evidentiary procedures. Further, because Entergy never raised on rehearing the argument that the *Mobile-Sierra* public interest standard, *see United Gas Pipe Line Co. v. Mobile Gas Service Corp*, 350 U.S. 332, 345 (1956); *Federal Power Commission v. Sierra Pacific Power Co.*, 350 U.S. 348, 355 (1956), should be employed to review its tariff filing, the argument is not properly before the court, *see* FPA § 313(b), 16 U.S.C. § 825*l*(b); *United Distributors*, 88 F.3d at 1170; the record references that Entergy supplies in its Reply Brief refer only to its argument that the Commission failed to hold an evidentiary hearing and to give notice, and failed to explain why direct assignment of costs is unjust or unreasonable.

Accordingly, we deny the petition for review.