CUDAHY, Circuit Judge,
dissenting.
The issues presented here are practically identical with those that we dealt with in Illinois Commerce Comm’n v. FERC, 576 F.3d 470 (7th Cir.2009)(“Illinois Commission I ”). I filed a dissent in that case and I emphatically reiterate its contents here.
The majority has expressed a need for more precise numbers about benefits, burdens and a variety of other aspects. Now it has enhanced that need by suggesting the use of cost-benefit analysis (a method, some think, of dressing up dubious numbers to reach more impressive solutions). I will say preliminarily that I think the majority is under the impression that somehow there is a mathematical solution to this problem, and I think that this is a complete illusion. Despite the frequency with which cost-benefit analysis is used, it does not resolve the difficulty of accurately or meaningfully measuring the costs and benefits involved with these grid strengthening projects. Cost allocation, particularly at these extraordinarily high voltages, is far from a precise science, and there are no mathematical solutions to determining benefits region by region or subregion by subregion. See PJM Interconnection, L.L.C., 142 FERC P 61216, ¶ (2013) (“Remand Rehearing Order”)(noting the difficulty of precisely quantifying future benefits); see also Illinois Commerce Comm’n v. FERC, 721 F.3d 764, 774 (7th Cir.2013) (“Illinois Commission 77”)(same). Both parties acknowledged this much at argument. Cost allocation is a judgmental matter and should be treated as such. E.g., Alabama Elec. Co-op., Inc. v. FERC, 684 F.2d 20, 27 (D.C.Cir.1982) (explaining the cost causation principle in a different context). Cost allocation produces approximate results and requires selection of the most appropriate methodology among many, none of which are necessarily “right.” This is one reason courts should generally be deferential to FERC’s technical analysis; and, I think somewhat hereti-cally, because the majority’s notions of costcausation and related technical concepts were not developed in a context of extra-high voltage projects forming a backbone framework, judicial precedents involving radically distinguishable arrangements, especially those involving lower voltages, are dubious guides to developing an appropriate methodology here.
In addition, the majority indulges in descriptions of many elements of the PJM grid and their functions without reference to any engineering evidence in support. For example, the majority claims that “the cities in the eastern region (of PJM) use even lower voltage (230 kv lines) than the cities in the western region, but most of the power plants are farther away from the customers than in PJM’s western region and therefore 500 kv lines are preferred even though more expensive; the reason is that higher voltage reduces [line loss].” Such a statement is at best a vast oversimplification, and the comment that “it’s unlikely that much electricity will be transmitted from the eastern to the western utilities via the new transmission lines” *566 is based on ignoring the potential for future developments of generation and transmission.
In fact, the entire thrust of the majority is toward precise cost causation, even in the present case, where that is indeterminate or at least obscure. The effect of the majority opinion is to emphasize functional relationships of the fragments of PJM rather than its value as a unique whole. I do not agree with the majority (or the Commission) that postage stamp cost distribution is “crude.” The reason ascribed by the majority for this deficiency assumes that some other methodology, like DFAX, can trace the benefits of additions with precision — an ability convincingly rejected by the Commission. In fact, the postage stamp methodology is the only one that can be mathematically verified. Thus, if one knows the total cost of the improvements and the total amount of the electrical output, one divided by the other provides an unarguable dividend representing the uniform burden of the various segments. Other methodologies provide approximations, but no more. The majority cites Illinois Commerce Comm’n v. FERC, 721 F.3d 764, 774 (7th Cir.2013), the “wind power decision,” as evidence of tolerance for postage stamp allocation but fails to indicate why that decision is not more broadly precedential for this one. In an elaborate effort to distinguish the very similar wind power decision, the majority underestimates the role of a ultra high-voltage backbone in equalizing benefits for all grid members. Why should not uniformity of benefit as provided by the postage stamp approach be the starting point in both cases?
In its critical analysis of an abandoned project in New Jersey the majority cites the alleged single reason for building the project (rather than benefits derived from it). The majority then, by recourse to a Distribution Factor Analysis (DFAX) approach, claims that the New Jersey utilities have been virtually unscathed while Commonwealth Edison has been grossly overcharged. Since this example does not even purport to measure respective benefits (but focuses on motives for construction), I am afraid that it compares apples to (abandoned) oranges. The majority apparently seeks to compare an a priori reason for building the line with benefits (a posteriori) derived from it.
In the next paragraph the majority repeats that our earlier opinion asked for an “articulable and plausible reason” to believe that certain benefits exist, but rejects the Commission’s efforts to provide one for alleged lack of obviously obscure detail. This goes far beyond the proper scope of judicial review. The majority derogates the prospect of harnessing ocean winds, minimizing the well-known efforts to establish a wind farm in the Cape Cod area on the grounds that that transmission project (like many, many others) is controversial. More importantly, the majority seems to devalue future impacts of projects lasting for a half century by improperly discounting future benefits.
I could go on reciting in the case of Dayton Power and Light the drumbeat for “precision,” which is simply beyond human capability. I have the impression that the majority is charging the Commission with lack of commitment in pursuing a “two plus two equals four” solution, but the Commission is dealing with incommensurable forces and conditions as skillfully and honestly as it can. It has my sympathy as well as my respect.
The majority casually concedes the central point that Commonwealth Edison joined PJM for the dominant reason of improving its reliability, but in its unremitting pursuit of fragmentation it insists on identifying exactly the source of the relia *567 bility instead of recognizing PJM as an extraordinarily sophisticated centrally dispatched unit acting as a whole. Nowhere does Commonwealth Edison, in its pursuit of reliability, request a strengthening of some part of the grid, but apparently relies on the reliability that the entire grid provides. It should be no surprise that the Commission split on how to respond to the demands of the majority for more and more precision — specious or otherwise— and in the end the majority concedes that its demand for numbers may be unobtainable and we may have to accept whatever the Commission can produce — whether second best, third best, or whatever. The majority even approves rejection of DFAX, but this was the very basis on which the protesters brought this lawsuit. The only inescapable requirement of the majority seems to be finality and an end to litigation; in that respect I certainly agree with the majority.
At one point the majority complains because the Commission fails to specify the degree of “radiation” from an upgraded facility and then recites with apparent authority a difference in benefits and lack of uniformity between the eastern and western utilities. Much of this is an effort to supply various details of electrical phenomena, much more the business of the Commission than of this court. The majority seems willing to pursue these details, as speculative and unsupported conclusions, and faults the Commission for not attaching precise magnitudes to its own bottom lines. This is not judicial review; it is manufacturing its own “evidence” as a substitute for the Commission’s but still seeking greater exactitude. In any event, since the majority seems to feel free to second guess the Commission, I will indulge in the same freedom (hopefully without too much violence to the Chenery principle) in proposing my own rationale for upholding the FERC proposal.
First of all, I think it makes a great deal of sense to start with the presumption that the costs of these extraordinarily high voltage lines ought to be allocated on a shared cost or postage stamp or “socialized” basis.[1] These extraordinarily high voltages are not commonly found in electrical transmission systems generally and, if they are found, they constitute what seems to be the backbone of an electrical grid. See PJM Interconnection L.L.C., 138 FERC P 61230, ¶ (Mar. 30, 2012) (“Remand Order”). By that, I mean that they are capable of transmitting large quantities of bulk power long distances to make the entire grid more reliable and more efficient. Id. By their very nature their impacts are broader both geographically and temporally; that is, it’s much more difficult to pinpoint their exact benefits to some other part of the system or to confine them to what is going on today rather than tomorrow. See Remand Rehearing Order ¶ 67. In this proceeding, the Commission considered the application of cost allocation by Distribution Factor Analysis (DFAX) but rejected this approach for, I think, adequate reasons[2] — essentially that *568 precise benefits and temporally limited impacts were impossible to determine with this approach. See Remand Order ¶37. On the other hand, the petitioners here base their entire case upon an application of this methodology. This is the essence of the case; I think the so-called DFAX methodology is appropriate for relatively lower voltage transmission, but it is unsuitable for the extraordinarily high voltage backbone for the reasons I have mentioned above. Id.
If we start with a presumption that the cost of extraordinarily high voltage transmission lines should be allocated on a shared cost or postage stamp basis, I see no reason to depart from that presumption here. The reasons on which the protesters rely are based on an application of the DFAX methodology, which the Commission has found to be inappropriate for reasons that no court should intervene to reject. See id. ¶¶ 36-47. In fact, I think that the rejection here illustrates the dangers of substituting the court’s findings in these technical matters for the Commission’s. In general, my view of starting with a presumption (rebuttable, of course) of shared costing for extraordinarily high voltage lines corresponds to the reality of the situation reflecting why the line is there and what its basic function is, namely to make the entire grid more functional.[3] See id. ¶ 21. The protests here are based on the approach of measuring the impact of the backbone network and attempting to target its broad effect to some subregion of the grid.
As a matter of equity, many tears have been shed here over the plight of Dayton Power & Light, and particularly, Commonwealth Edison (which, as the power supplier of the forum is singled out), but these utilities joined the system only a few years ago, even though they are many hundreds of miles away from the original PJM (which has been in business for many, many years and was unusually sophisticated as a centrally dispatched grid). Interestingly, neither Commonwealth Edison nor its parent Exelon is a party to this proceeding, which may reflect a less intense degree of objection to the outcome. Commonwealth Edison was well aware of the reliance on ultra high voltage transmission as a basic element in improving reliability in PJM, and Commonwealth Ed *569 ison is significantly quoted by the majority as having been motivated to join PJM by its need for reliability benefits. Perhaps, Commonwealth Edison was surprised that the cost of any additions would follow a postage stamp basis rather than a DFAK basis, but I doubt that that possibility escaped them completely and I see nothing inequitable about requiring them to participate in the costs of these additions, which are basically for the benefit of the entire grid. This is the essence of my difference with the majority, which says the Commission’s “basic fallacy” is to assume that the 500 kv lines are for the benefit of the entire grid. I do not think this is a fallacy, and even Commonwealth Edison seems to recognize that reality. Commonwealth Edison came late to the party, and I think it is not unfair that they participate on a pro rata basis in these developments.
The majority also seems to be totally convinced of the position that, since the electrical flows at the moment are primarily from east to west, almost the entire burden should be placed on the eastern utilities; and in that regard my colleagues were very skeptical of the development of off-shore wind farms in the Atlantic Ocean or other such future developments in electrical generation and transmission, as a possible basis for reversing the flow of power in the future. I can only guess the specific prospects of offshore wind farms or other developments, or how these specific developments might affect the situation, but I certainly don’t think it is unlikely that there will be significant changes in electrical flows over these new facilities during the next 40 or 50 years when the facilities will be in operation. Confining the Commission to the DFAX methodology, which substantially restricts considerations of grid development over time, the protesters’ approach ignores the function and outlook of a high voltage backbone. See Remand Order ¶¶ 39, 41, 43, 111.
I suppose that the next version of things that we may get from back from FERC will be some sort of hybrid system, which would bow in the direction of what I think should be presumptive (namely, a postage stamp methodology for these extremely high voltage facilities), while maintaining some aspects of an approach that superficially conforms to various radically distinguishable judicial precedents. In my opinion this will be unfortunate, since I firmly believe we should allow the FERC to be creative in addressing these unprecedented problems.
For these reasons I respectfully dissent.

. Indeed, the majority in Illinois Commission I acknowledged that a presumption of grid-wide benefits is appropriate for new projects because the grid is integrated and the benefits are inherently spread over the entire grid. 576 F.3d at 477 (“[FERC] can presume that new transmission lines benefit the entire network by reducing the likelihood or severity of outages.”); see also Entergy Servs., Inc. v. FERC, 319 F.3d 536, 543 (D.C.Cir.2003)(noting that upgrades intended to preserve reliability are presumed to benefit the system as a whole). Given the backbone nature of these extra high-voltage projects, I think this presumption is even more compelling.

. Under the DFAX methodology, PJM selects the single most severe reliability violation for each project, models it on a 5-year period, and does not revisit the allocation even if *568 changes occur to the system before or during construction. See Remand Order ¶ 41, 44. This method also bases allocations solely on who causes the need for the new project, and does not consider who will use the new line once it is built. See id. In other words, the DFAX method is based on limited and temporally inflexible information. Conversely, FERC found that the regional allocation method was adjusted every year to account for changes to the system, as well as use a 15-year projection which allows for greater planning for future developments affecting the grid. See id. ¶¶ 97, 117.

. Reliability is not a middling concern — power outages and the more serious "cascading” outages are not uncommon. In 2003 a cascading outage in Ohio spread across several states, left over 50 million people and resulted in economic losses in the billions. E.g., Mike Edmonds, 10 Years Later, Power Outages Still Cost U.S. Billions Each Year, GridTalk (Aug. 14, 2013), available at http://www.sandc.com/ blogs/index.php/2013/08/10-years-laterpower-outagesstillcost-u-s-billions-each-year. Estimates put the annual cost of outages upwards of $80 billion. See Kristina Hamachi LaCom-mare & Joseph H. Eto, Understanding the Cost of Power Interruptions to U.S. Electricity Consumers, Lawrence Berkeley National Laboratory, (Sept.2004), available at http://certs.lbl. gov/pdi/55718.pdf. Experts have estimated that the reliability savings from strengthening the transmission backbone, and thus the entire grid, could be as much as $49 billion, annually. See Massoud Amin, U.S. Electrical Grid Gets Less'Reliable, IEEE Spectrum (Dec. 30, 2010), available at http://spe-ctrum.ieee. org/energy/policy/us-electrical-grid-gets-less-reliable.