# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 8, 2018        Decided June 8, 2018

No. 16-1342

ESI ENERGY, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

PJM INTERCONNECTION, L.L.C. AND WEST DEPTFORD
ENERGY, LLC,
INTERVENORS

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Larry F. Eisenstat* argued the cause and filed the briefs for petitioner.

*Nicholas M. Gladd*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *David L. Morenoff*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Ashley C. Parrish* argued the cause for intervenor for respondent West Deptford Energy, LLC. With him on the brief were *Justin A. Torres*, *Neil L. Levy*, and *Stephanie S. Lim*.

Before: MILLETT and WILKINS, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge:*    For a second time, we consider the ramifications of a utility filing more than one rate with the Federal Energy Regulatory Commission ("FERC" or the "Commission") during the time in which the utility negotiates an agreement with a prospective customer. *See W. Deptford Energy, LLC v. FERC*, 766 F.3d 10 (D.C. Cir. 2014). Specifically, we are asked to determine which rate governs:  the rate in effect at the time negotiations commenced or the rate in effect at the time the agreement was completed.  We are also asked to consider whether, if the rate on file at the time the agreement was completed governs, FERC reasonably interpreted the new rate.

Upon review, we uphold FERC's determination that the governing rate is the rate in effect at the time the agreement was completed.  Because we find that FERC properly considered the Court's findings on remand, adequately explained its decision, and properly considered the evidence, FERC did not act arbitrarily and capriciously in interpreting the new rate.  We therefore deny the Petition for Review.

**I.**

The Federal Power Act, 16 U.S.C. §§ 791a *et seq.*, charges the Commission with regulating "the transmission of electric energy" and "the sale of electric energy at wholesale" in interstate commerce, *id.* § 824(b)(1).  In exercising that authority, the Commission must ensure that "[a]ll rates and charges" for the "transmission or sale of electric energy subject to" its jurisdiction are "just and reasonable," and that no public

utility's rates are unduly discriminatory or preferential. *Id.* § 824d(a), (b); *see NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n*, 558 U.S. 165, 167 (2010).

To that end, the Act requires every public utility to "file with the Commission" and "keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission." 16 U.S.C. § 824d(c). That obligation applies whether the rates and charges are set "unilaterally by tariff" or agreed upon in individual contracts between sellers and buyers. *NRG Power Mktg.*, 558 U.S. at 171. When a public utility seeks to change its filed rate, it must "fil[e] with the Commission . . . new schedules stating plainly the change or changes . . . and the time when the change or changes will go into effect." 16 U.S.C. § 824d(d).

The Federal Power Act's express mandate of openness, transparency, and consistency in rates prevents discrimination, promotes fair and equal access to the utilities' services, ensures the stability and predictability of rates, and reinforces the Commission's jurisdictional authority. *See Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 130-31 (1990); *Consol. Edison Co. of N.Y. v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003); *Consol. Edison Co. of N.Y. v. FERC*, 958 F.2d 429, 432 (D.C. Cir. 1992).

To foster competition in the wholesale energy market, the Commission drastically overhauled the regulatory scheme for public utilities in 1996. As part of that effort, the Commission ordered regulated utilities to separate financially their wholesale power-generation and power-transmission services. *See Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and*

*Transmitting Utilities*, Order No. 888, 61 Fed. Reg. 21,540 (Apr. 24, 1996); *see also New York v. FERC*, 535 U.S. 1, 11 (2002) (describing Order No. 888). Accordingly, public utilities must now file tariffs with the Commission establishing separate rates for wholesale power-generation service, transmission service, and any ancillary service. *New York*, 535 U.S. at 11. In addition, they must "take transmission of [their] own wholesale sales and purchases under a single general tariff applicable equally to [themselves] and to others." *Id.*

Problems soon arose, however, because every time a new generator of electricity asked to use a transmission network owned by another – to interconnect the two entities – disputes between the generator and the owner of the transmission grid would arise, delaying completion of the interconnection process. *See Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 at P. 11 (2003). The Commission waded into those disputes case by case, delaying entry into the market by new generators and providing an unfair competitive advantage to utilities owning both transmission and generation facilities. *Id.* at PP. 10-11.

To address those issues, the Commission in 2003 issued Order No. 2003, 104 FERC at PP. 11-12. That order replaced the Commission's case-by-case approach with a standardized process. The Order requires all regulated utilities that "own, control, or operate" transmission facilities to include standardized interconnection procedures and a form interconnection agreement in their filed tariffs. *Id.* at P. 2. By mandating that "standard set of procedures," the Commission "minimize[d] opportunities for undue discrimination and expedit[ed] the development of new generation, while protecting reliability and ensuring that rates are just and reasonable." *Id.* at P. 11.

5

## II.

### A.

PJM Interconnection, LLC ("PJM"), is a regional transmission organization, an independent entity that operates transmission facilities in thirteen states and the District of Columbia. *See FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 442-43 (D.C. Cir. 2005). Under PJM's Open Access Transmission Tariff ("PJM Tariff"), the interconnection process begins when a generator of electricity submits an interconnection request to PJM. *W. Deptford*, 766 F.3d at 13. Each request is placed into a "first-come, first-served queue." *Marcus Hook*, 430 F.3d at 443; *see* PJM Tariff § 201.

The submission of an interconnection request triggers a review by the utility and holds the requestor's place in the interconnection queue until it concludes. During this process, PJM conducts a series of studies to determine the impact of a generator interconnection request on the PJM transmission system, including the need for upgrades or additions to those transmission facilities, *W. Deptford*, 766 F.3d at 14, and an estimate of the requestor's cost responsibility for any needed upgrades, *see Marcus Hook*, 430 F.3d at 443. Those studies do "not set a rate for interconnection service," however; they merely provide "a non-binding estimate of costs." *Dominion Res. Servs., Inc. v. PJM Interconnection, LLC*, 123 FERC ¶ 61,025 at P. 52 (2008). Customers are thus free to "terminate or withdraw their interconnection requests" at any time. *Marcus Hook*, 430 F.3d at 443. Once PJM completes the studies, it provides the requestor with a proposed interconnection service agreement that "specifies the customer's actual cost responsibility," including the cost of any upgrades needed to PJM's transmission network to sustain the increased demand. *Id.*

While a new service request might be what prompts a network upgrade, the "integrated transmission grid is a cohesive network," *Entergy Servs., Inc.*, 96 FERC ¶ 61,311, ¶ 62,202 (2001), and thus completed upgrades generally "benefit all transmission customers," Order No. 2003, 104 FERC at P. 21. For that reason, those generators who have to pay for upgrades under the PJM Tariff receive incremental auction-revenue rights that give the generator the right to revenue from future sales of transmission services associated with the new or upgraded facility. *See W. Deptford*, 766 F.3d at 14; *see also PJM Interconnection, LLC*, 126 FERC ¶ 61,280, ¶ 62,589 (2009) (describing the function of auction-revenue rights). That auction revenue, in turn, partially compensates the generator for the financial burden of improving the transmission network for all users. *See* Order No. 2003, 104 FERC at P. 694.

In 1998, three generators submitted interconnection requests to PJM for the following projects: the Mantua Creek Project, the Liberty Electric Project, and the Marcus Hook Project. Order Denying Rehearing, *PJM Interconnection, LLC*, 139 FERC ¶ 61,184 at P. 3 (2012) ("2012 Order"); *Marcus Hook*, 430 F.3d at 444. PJM determined that the projects' combined load would "push [its] system beyond the breaking point," and thus advised a $13 million upgrade (the "Upgrade" or "Network Upgrade 28") to a transmission circuit. *Marcus Hook*, 430 F.3d at 444. Because that Upgrade was unnecessary at the time the first project, Mantua Creek, entered the queue, Mantua Creek was not assigned any cost responsibility for the Upgrade. *Id.* Marcus Hook and Liberty Electric bore it all, with 90% of the Upgrade's cost assigned to Marcus Hook. *See id.*; *see also* 2012 Order at P. 3. Both generators moved forward with the project, with Marcus Hook agreeing to pay "over $10 million of the upgrade's total cost." *Marcus Hook*, 430 F.3d at 444.

As the Upgrade neared completion, Mantua Creek unexpectedly cancelled its project and withdrew from the queue. *See* 2012 Order at P. 3. That decrease in the demand for power made the Upgrade unnecessary to support Marcus Hook's and Liberty Electric's projects. But PJM determined that completion of the almost-final Upgrade was the "least costly alternative," and thus "trudged forward and completed the upgrade." *Marcus Hook*, 430 F.3d at 444. The Upgrade was placed into service in June 2003.

Marcus Hook felt differently about being required to continue financing the Upgrade and filed a complaint with the Commission seeking a refund. *Marcus Hook*, 430 F.3d at 444-45. The Commission rejected Marcus Hook's complaint. *See FPL Energy Marcus Hook, L.P. v. PJM Interconnection, LLC*, 107 FERC ¶ 61,069 (2004) (*Marcus Hook I*), *reh'g denied*, 108 FERC ¶ 61,171 (2004) (*Marcus Hook II*). In 2005, this Court upheld the Commission's decision in relevant part. *Marcus Hook*, 430 F.3d at 447-49.

The next year, West Deptford submitted an interconnection request to PJM. 2012 Order at P. 4. Under Section 37.7 of the PJM Tariff that was in effect on the date that West Deptford submitted its request (July 31, 2006), PJM could seek reimbursement for a previously constructed network upgrade from a new applicant for interconnection like West Deptford if the new proposed project (i) used the added capacity created by the upgrade or would have required the upgrade itself, (ii) the cost of the upgrade was at least $10 million, and (iii) the upgrade was "placed in service no more than five years prior to the affected Interconnection Customer's Interconnection Queue Closing Date." *W. Deptford*, 766 F.3d at 17 (quotation marks and citation omitted).

Based on Section 37.7, PJM's first study of West Deptford's project proposed imposing financial responsibility for the Upgrade on West Deptford. *See* 2012 Order at PP. 5, 9; PJM Feasibility Study 8 (Nov. 2006). West Deptford did not dispute that, if the 2006 Tariff controls its interconnection agreement, it must reimburse Marcus Hook and Liberty Electric for the costs of the Upgrade. Order Accepting Interconnection Service Agreements, *PJM Interconnection, LLC*, 136 FERC ¶ 61,195 at P. 28 (2011) ("2011 Order").

Eighteen months later, while West Deptford's interconnection request was still pending, PJM filed several proposed amendments to its tariff. 2012 Order at P. 11; *see also Dominion*, 123 FERC ¶ 61,025 at PP. 1-3 (settlement of administrative challenge to PJM Tariff resulted in proposed amendments). One proposed amendment significantly changed Section 37.7's assignment of financial responsibility for prior upgrades. Under Section 219 of the new 2008 tariff, PJM could seek reimbursement for previously constructed network upgrades only for a period of five years "from the execution date of the Interconnection Service Agreement for the project that initially necessitated the requirement for the Local Upgrade or Network Upgrade." PJM Tariff § 219(a). While the tariff was silent about the effective date of that change, a transmittal letter from PJM noted that the next interconnection queue would begin on August 1, 2008, and then "request[ed] an August 1, 2008 effective date for these Tariff revisions." PJM Transmittal Letter 17. Because Liberty Electric executed its interconnection agreement on May 14, 2001, and Marcus Hook executed its agreement on January 22, 2002, 2012 Order at P. 10, the Commission and PJM agreed that, if the 2008 tariff controls, then that tariff's five-year time limit insulates West Deptford from having to pay for the Upgrade. 2011 Order at P. 34.

Proceedings commenced before the Commission challenging aspects of the 2008 tariff, but West Deptford was not a party. In those proceedings, PJM received an inquiry asking whether the new cost-allocation provisions would "apply only to projects that enter the interconnection queue on or after the proposed effective date of August 1, 2008 or whether they will apply also to projects that have entered the queue before that date." Request for Clarification of American Municipal Power-Ohio, Inc. at 1, *Dominion Res. Servs., Inc. v. PJM Interconnection, LLC*, Docket No. EL08-36-001 (FERC June 20, 2008). PJM responded that one revised provision of the tariff not at issue here "will become effective on August 1, 2008, and will be initially applied to the U2-Queue (this queue will close on July 31, 2008)." Answer of PJM Interconnection, LLC to Request for Clarification of American Municipal Power-Ohio, Inc. at 4, *Dominion Res. Servs., Inc. v. PJM Interconnection, LLC*, Docket No. EL08-36-001 (FERC July 7, 2008). With respect to Section 219(a), the provision at issue here, PJM separately stated that "[t]hese modifications are intended to be effective as of August 1, 2008, and will be initially applied to the U2-Queue." *Id.*

On August 19, 2008, the Commission accepted PJM's revised tariff, but referenced only PJM's clarification of the effective date for the provision not relevant here, stating that Section 217.3a "will be applied to the U2-Queue effective August 1, 2008." FERC Letter Order at 1, *Dominion Res. Servs., Inc. v. PJM Interconnection, LLC*, Docket No. EL08-36-001 (FERC Aug. 19, 2008). The Commission did not mention PJM's clarification of the effective date for the provision at issue in this case, Section 219(a). *See id.*

Over the next three years, PJM conducted additional studies of West Deptford's interconnection request. In these studies, PJM expressed its intention to charge West Deptford

the full $10 million for the Upgrade, as had been permitted by the superseded tariff. PJM System Impact Study Report 4-5 (Sept. 2010); PJM Facilities Study Report 4, 10 (Apr. 2011). West Deptford claimed, and no one disputed, that it repeatedly objected to this attempted cost allocation.

**B.**

In 2011, PJM provided West Deptford a draft interconnection service agreement that imposed the full cost of the Upgrade on West Deptford. Mot. to Intervene & Protest of West Deptford Energy, LLC 9, *PJM Interconnection, LLC*, Docket No. ER11-4073-000 (FERC Aug. 8, 2011) ("West Deptford Protest"). West Deptford objected, *id.*, and PJM filed the unexecuted agreement with the Commission, seeking its resolution of the dispute. 2012 Order at P. 6. West Deptford argued, as relevant here, that imposing the superseded tariff's terms for cost allocation violated both the filed rate doctrine and past Commission precedent enforcing the terms of tariffs that were in effect when an interconnection agreement was executed or filed, rather than when a prospective customer entered the queue. West Deptford Protest 15.

The Commission rejected West Deptford's protest. Acknowledging that West Deptford could not be liable for the Upgrade under the on-file tariff, the Commission nonetheless concluded that the cost-allocation provisions of the superseded tariff should govern "since, at the time when West Deptford entered the PJM interconnection queue, that provision was the one that established its financial responsibility." 2011 Order at P. 35. According to the Commission, that fact put West Deptford "on notice of the costs to which it potentially would be liable." *Id.* at P. 38.

West Deptford requested rehearing, which the Commission denied. The Commission said that PJM could enforce the superseded tariff's cost-allocation rule because, during the tariff-revision proceedings to which West Deptford was not a party, PJM had clarified that the new tariff's cost-allocation provision (Section 219) would only apply starting with projects in the "U2-Queue," which closed in the Summer of 2008. 2012 Order at P. 31. The Commission also reasoned that each of PJM's interconnection studies had provided West Deptford notice of PJM's intent to enforce the superseded tariff's cost-allocation provision. *Id.* at P. 28. Finally, with respect to past Commission precedent, the Commission stated that its decisions did not bind it to "a single policy to address all of the myriad issues that may arise from a change to cost allocation in the interconnection process." *Id.* at P. 38.

West Deptford timely petitioned for review, and PJM and Marcus Hook intervened. On review, this Court vacated the Commission's orders in part and remanded the case because the Commission "provided no reasoned explanation for how its decision comport[ed] with statutory direction, prior agency practice, or the purposes of the filed rate doctrine." *W. Deptford*, 766 F.3d at 12.

On remand, FERC reversed its prior position and concluded that Section 219 – the tariff provision in effect at the time the interconnection agreement was filed – applied to PJM's assessment of costs to West Deptford because none of the evidence gave West Deptford sufficient notice that the old tariff would govern its interconnection agreement. Order on Remand, 153 FERC ¶ 61,327 at P. 14 (2015); Order on Rehearing, Compliance, and Clarification, 156 FERC ¶ 61,090 at P. 11 (2016) ("Rehearing Order"). FERC based its decision on the "significant skepticism" this Court expressed "with [its]

determination that [the old tariff] should apply" and the "numerous shortcomings" the Court identified in the Commission's analysis. Rehearing Order at P. 10.

The Commission also determined that Section 219 was ambiguous as to what action needed to be taken within the prescribed five-year window in order to trigger cost responsibility, but concluded that the most reasonable interpretation was that the appropriate "end-date" was the date on which West Deptford signed its interconnection agreement. *Id.* at P. 22. In doing so, the Commission rejected Marcus Hook's argument that Section 219 should be interpreted such that an interconnection customer is liable for the cost of network upgrades that entered service during the five years preceding the customer's queue-entry date. *Id.* at PP. 21-22.

Marcus Hook[1] now contends that on remand the Commission acted arbitrarily and capriciously and did not engage in reasoned decisionmaking insofar as the Commission (1) determined that West Deptford's responsibility to pay for the network upgrades was to be determined in accordance with PJM Tariff Section 219 rather than Section 37.7 and (2) adopted an interpretation of Section 219 that conflicts with FERC precedent, the evidence on which FERC relied, and the policies underlying the judicially recognized exceptions to the filed rate doctrine.

---

[1] The Court previously granted ESI Energy's motion to substitute itself for FPL Energy Marcus Hook, L.P. Doc. No. 1651533. However, to maintain consistency with the earlier proceedings and the parties' briefing, this opinion refers to Petitioner as "Marcus Hook" instead of ESI Energy.

**III.**

The Court reviews Commission orders under the arbitrary-and-capricious standard, and we will uphold the Commission's factual findings if they are supported by substantial evidence. *See* 5 U.S.C. § 706(2); *see also, e.g.*, *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010) (per curiam). Under those standards, the Court must determine whether the Commission "examined the relevant data and articulated a rational connection between the facts found and the choice made." *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009) (internal alterations and citation omitted). While the Court defers to the Commission's interpretation of its own precedent, *NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 799 (D.C. Cir. 2007), the Commission cannot depart from those rulings without "'provid[ing] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" *Alcoa*, 564 F.3d at 1347 (quoting *Entergy Servs., Inc. v. FERC*, 319 F.3d 536, 541 (D.C. Cir. 2003)). Our review of the Commission's interpretation of filed tariffs is "*Chevron*-like in nature," which means we give "substantial deference" to the Commission's interpretation unless "the tariff language is unambiguous." *Old Dominion Elec. Co-Op., Inc. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008) (internal quotation marks omitted).

**A.**

On remand, the Commission held that West Deptford's responsibility to pay for the network upgrades was to be determined in accordance with PJM Tariff Section 219 rather than Section 37.7. To sustain that determination, the Commission was obligated to provide a reasoned explanation of how applying Section 219 comported with the text of the

Federal Power Act and prior Commission precedent. Unlike its prior decision, the Commission's decision on remand did both.

First, FERC reasonably relied on our decision in *West Deptford* to conclude, contrary to its prior finding, that it was "not sufficiently clear . . . that the projects in earlier queues would continue to be governed by section 37.7." Order on Remand at P. 15. In its initial decision, the Commission found that Section 219 was plainly prospective based on PJM's Transmittal Letter and PJM's answer in *Dominion*, and thus that Section 37.7 governed West Deptford's interconnection agreement. *See generally* 2011 Order; 2012 Order. In *West Deptford*, we concluded that both the letter and PJM's answer in *Dominion* were ambiguous. 766 F.3d at 18-19. As to the Transmittal Letter, we found that it was "silent about whether the date of the interconnection agreement or of entry into the queue had to fall on or after [August 1, 2008]," *id.*, and explained that the introductory clause – in which PJM noted that it requested August 1, 2008, as the effective date "[b]ecause the next interconnection queue will begin" on that date, PJM Transmittal Letter 17 – "simply add[ed] to the confusion about what must be in place by August 1st." *W. Deptford*, 766 F.3d at 18-19. We similarly found that PJM's answer in *Dominion* was "confusing," because one sentence suggested prospectivity while another suggested the tariff would apply retrospectively. *Id.* at 23. Under the circumstances, it was reasonable for FERC, on remand from this Court, to rely on these findings, and no additional explanation was needed to support its changed position.

In light of this ambiguity and "an unbroken Commission practice of holding that interconnection agreements filed after the designated effective date of an amended tariff are governed by the amended tariff, unless the amended tariff has a

grandfathering provision," *id.* at 19-20 (citing cases); Order on Remand at P. 15 (adopting our discussion of FERC precedent in other Commission interconnection-queue cases), the Commission determined it could not reasonably conclude that West Deptford was on notice that Section 219 would not apply to its interconnection agreement. The reliance on our opinion is proper, and FERC's explanation suffices. *See Hall v. McLaughlin*, 864 F.2d 868, 872 (D.C. Cir. 1989) ("Where the reviewing court can ascertain that the agency has not in fact diverged from past decisions, the need for a comprehensive and explicit statement of its current rationale is less pressing.").

While Marcus Hook does not contest the Commission's understanding of its own precedent, Marcus Hook maintains that the Commission erred by failing to consider extrinsic evidence and Marcus Hook's additional arguments on remand. As to the first, Marcus Hook contends that the extrinsic evidence "incontestably shows that Section 219 was not to be applied to West Deptford," and yet, FERC ignored such evidence improperly in reliance on our decision in *West Deptford*. Pet'r's Br. 31-33. However, the Commission's interpretation of our decision was correct. In *West Deptford*, we rejected reliance on the evidence Marcus Hook cites – PJM's Transmittal Letter, PJM's answer in *Dominion*, and the West Deptford Facilities Study Agreement. With respect to the letter and PJM's answer, as previously discussed, FERC found, based on our prior decision, that neither provided any clarity regarding Section 219's applicability. Similarly, we rejected the argument that the facilities studies agreements supported Marcus Hook's position. *W. Deptford*, 766 F.3d at 24 (noting that because West Deptford repeatedly objected to any such imposition of cost responsibility, "one-way assertions" in a facilities study agreement cannot put a party on notice, and Commission precedent treats such studies as "non-binding estimate of costs"). There was no need for FERC to reconsider

the effect of the evidence because this Court had expressed skepticism about the evidence's ability to resolve the present question.

As to the latter, Marcus Hook contends that the Commission refused to consider additional arguments it raised on remand, and therefore, the decision is arbitrary and capricious. We disagree. The first objection Marcus Hook claims that FERC ignored was that West Deptford's parent company, LS Power Associates, was a party to the *Dominion* proceeding – the 2008 proceeding in which the new tariff replaced the old tariff – and therefore notice provided in that proceeding could be imputed to West Deptford. This objection is waived, however, because Marcus Hook did not raise it on rehearing and has provided no reasonable ground for its failure to do so. 16 U.S.C. § 825*l*(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is a reasonable ground for failure to do so."). We find that the remaining objections Marcus Hook claims were ignored, including arguments Marcus Hook repeats with respect to the facilities study agreements, were directly and adequately addressed by the Commission.

Accordingly, we conclude that the Commission reasonably determined that Section 219 should govern West Deptford's interconnection agreement.

**B.**

We next address Marcus Hook's argument that even if the costs associated with Network Upgrade 28 are governed by Section 219 of the tariff, the Commission erred in determining that the execution date of West Deptford's interconnection

agreement was the relevant event for assigning cost responsibility under the tariff. Pet'r's Br. 40-41. As previously discussed, we give substantial deference to the Commission's interpretation of filed tariffs unless the language is unambiguous. *Old Dominion*, 518 F.3d at 48.

PJM Tariff § 219 provides as follows:

> Cost responsibility under this Section 219 may be assigned with respect to any facility or upgrade:

> (a) the completed cost of which was $5,000,000 or more, for a period of time not to exceed five years from the execution date of the Interconnection Service Agreement for the project that initially necessitated the requirement for the Local Upgrade or Network Upgrade.

Both parties agree that the tariff is silent with respect to the relevant event for determining cost responsibility under Section 219. Pet'r's Br. 40; Resp't's Br. 31 (citing Rehearing Order at P. 22); *see also* Order on Remand at P. 22. Accordingly, we will defer to the Commission's construction so long as that construction is reasonable. *Williams Nat. Gas Co. v. FERC*, 3 F.3d 1544, 1551 (D.C. Cir. 1993).

Here, the Commission concluded that the proper date for determining cost responsibility is the date on which the interconnection agreement is executed. Order on Remand at P. 22; Rehearing Order at P. 22. In its Order on Remand, the Commission supported this interpretation by pointing out that "the tariff identifies the assignment of cost responsibility . . . as the operative date, and that responsibility is not determined

until the interconnection agreement is executed." Order on Remand at P. 22. Additionally, FERC explained that this reading was "consistent with the court's determination that the interconnection agreement defines the tariff provisions applicable to the Marcus Hook interconnection." *Id.* On rehearing, the Commission expanded upon its reasoning, stating that its decision was "consistent with the purpose of Section 219, *i.e.*, to assign cost responsibility, since cost responsibility is assigned upon execution of the interconnection agreement" and "consistent with the overall intent of PJM's interconnection revisions to clarify the interconnection procedures and to shorten the window of cost responsibility." Rehearing Order at P. 22.

Marcus Hook contends that none of the Commission's justifications withstand scrutiny, and that the dispositive date should be either the date West Deptford submitted its interconnection request (July 31, 2006) or when PJM determined that Network Upgrade 28 was required for West Deptford's generation project to be interconnected (November 2006). Pet'r's Br. 41, 45. Although Marcus Hook's suggested interpretation is a possible reading of the tariff provision, it is no more reasonable than the one the Commission put forward. Accordingly, we find that the Commission did not err in its interpretation of Section 219 of the revised tariff.

For the foregoing reasons, we deny the Petition for Review.